Maurice L. Killian v. Commissioner.
Killian v. Commissioner
Docket No. 80861.
United States Tax Court
T.C. Memo 1961-83; 1961 Tax Ct. Memo LEXIS 267; 20 T.C.M. (CCH) 376; T.C.M. (RIA) 61083; March 27, 1961
*267 Kenneth B. Cope, Esq., for the petitioner. James D. Biltz, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies and additions to tax against the petitioner for the taxable year 1954, as follows: Additions to the Tax
Sec. 294
Sec. 294
(d)(1)(A),
(d)(2),
Taxable
I.R.C.
I.R.C.
Year
Deficiency
1939
1939
1954
$3,738.74
$288.46
$238.73
The sole issue for decision is whether $12,500 received by petitioner in connection with an agreement of sale and dissolution of a partnership engaged in the insurance business should be taxed as capital gain or as ordinary income. Findings of Fact Some of the facts are stipulated. They are found accordingly. Petitioner, Maurice L. Killian, resides in Melbourne Beach, Florida. He filed his income tax return for the year 1954 with the district director of internal revenue in Jacksonville, Florida. He will hereafter sometimes be referred to as petitioner. For many years petitioner was engaged in the insurance business in Canton, Ohio. In about 1939 petitioner employed two agents, Fry and Ryan, to work *268 as solicitors. On November 7, 1947, petitioner entered into a partnership agreement with these two men to carry on the insurance business. Ryan and Fry paid petitioner $3,000 cash and received a one-third interest in the business which continued under the name, The M. L. Killian Agency. The agreement provided that the partnership would commence on January 1, 1948 and continue for 10 years. The agreement also provided: ARTICLE 7. It is the intent of the parties and it is understood and agreed by and between them, that Maurice L. Killian is not turning over to the partnership any of his personal business (and, for the purposes of certainty, personal business shall be that business carried on the books of The M. L. Killian Agency as of the 1st day of January, 1948, wherein it is shown that Maurice L. Killian personally was the writing agent of said business), and it is further understood and agreed that Maurice L. Killian will continue to write and renew his personal business through The M. L. Killian Agency, and for such business shall receive the same personal commissions as he has formerly received for such business, the same to be differentiated from the Agency commission which *269 arises by virtue of such personal business, which said Agency commission shall at all times inure to the benefit of the partnership; and if Killian shall transfer, give away, or otherwise dispose of said personal business, he agrees that he will bind the transferee or donee thereof to continue to write and renew such business through the Agency; provided, however, the transferee or donee shall receive the standard sub-agent's commission currently being paid by the agency or other insurance agencies in the Canton, Ohio, area for the same type of business. The agreement further provided that petitioner was to receive $6,600 per year out of partnership profits for the duration of the partnership. If the partnership profits were insufficient, Fry and Ryan were to supply the deficit. At the end of the 10-year period, if the agreement was still in effect, and if Fry and Ryan had performed their part, it provided that: then and in such event Ryan and Fry shall become the full and complete owners of said partnership, and said Killian shall voluntarily withdraw from said partnership and shall execute and deliver to Ryan and Fry a bill of sale or other instrument of transfer, conveying said *270 Killian's interest in said partnership without further payment; provided, however, that said Killian shall retain full ownership and complete control over his personal business as hereinbefore stipulated. Petitioner's personal business involved principally fire, casualty insurance with a small amount of accident and health insurance, and some life insurance. Petitioner kept records, called "dailies", pertaining to the policies which he had sold. This information consisted of such things as the beginning and expiration dates of the policy, the type of insurance and the coverage. The dailies were used to provide information for renewals and servicing the policies. In writing fire and casualty insurance, as contrasted with life insurance, the producing agent is normally paid a commission only when the policy is sold or when renewed. On January 12, 1954, about four years before the partnership was to end, an agreement of sale of petitioner's personal business and dissolution of the partnership was entered into by the three partners. This agreement recited that: said Killian desires to sell all his right, title and interest in and to the partnership, the partnership assets, insurance *271 agency contracts, his right to share in renewal or continuing premiums paid by customers of the partnership, good will and right to use of the name M. L. Killian Agency, and to dissolve the existing partnership; * * *
NOW THEREFORE, in consideration of the several agreements and covenants hereinafter set forth * * *. * * * said Killian agrees to and does hereby sell and transfer to the Purchasers, [Fry and Ryan] all said Killian's right, title and interest in and to the partnership * * * and to the property and assets of said partnership * * * including but not limited to * * * customers and policy holders dailys [dailies] and records, all agency contracts with insurance companies, rights to receive or share in renewal or continuing premiums on policy and insurance contracts of every kind, all good will pertaining to the partnership, all Killian's rights to his so-called personal business and all business shown on the books of the partnership to the credit of said Killian as producing agent * * *. The agreement further provided that: As full consideration for all said Killian's rights and interests in said partnership * * * the Purchasers agree to pay * * * a total *272 aggregate sum of Thirty-six Thousand Five Hundred Dollars ($36,500.00), it being understood and agreed that there is included in said sum the balance of $24,000.00 remaining due from the Purchasers to said Killian under said Agreement of November 7, 1947. * * * The 1954 agreement also provided: As an additional consideration for the payment of the purchase price hereinbefore specified, said Killian agrees that he will not engage in the general insurance business or in the solicitation or sale of [enumerated types of insurance] * * * within the Counties of [named] in the State of Ohio for a period of five () years from and after the date of this Agreement * * *. Petitioner was in ill health at the time he entered into the 1954 agreement. He planned to, and subsequently did, leave Ohio to take up residence in Florida. Fry and Ryan knew of this intent when the 1954 agreement was entered into. Petitioner received no part of his compensation for the covenant not to compete. On his 1954 income tax return petitioner reported the entire $36,500 received under the 1954 agreement as a long-term capital gain. Sometime thereafter petitioner's 1954 return was subjected to audit. During *273 the course of the audit, without advice of counsel, petitioner, on June 19, 1958 submitted an affidavit to respondent in which he stated, in part: In January 1954, I sold my remaining interest in the partnership, and also my personal business, (this is business on which my name appeared as the producing agent). I received $36,500.00. $24,000.00 of this amount was for the balance due me under the partnership agreement, and $12,500.00 was received from the sale of the anticipated renewal commissions on my personal business. In the agreement of January 1954, I did agree to several other things, but I was not paid for doing so. Petitioner also had Fry and Ryan sign an affidavit which he had prepared, dated June 16, 1958, in which they described the partnership and sale agreements and stated, in part: * * * [Under the 1954 agreement] Killian was paid $24,000.00 for the balance to complete the amount which would be due him under the [1947) agreement * * *. At the same time [Fry and Ryan] purchased his personal business by paying him an additional sum of $12,500.00. This figure was arrived at by figuring up what we all agreed was a fair value of the anticipated renewal commissions *274 on his personal business. * * * However, this is to certify that [petitioner] was not paid any money for any part of the agreement except the $12,500.00 for the anticipated renewal commissions * * *. After consulting an attorney petitioner composed a third affidavit which he had Fry and Ryan sign and submit to respondent. This affidavit stated, in part: * * * At the [time of the 1954 agreement] we [Fry and Ryan] purchased his personal business by paying him an additional sum of $12,500.00. This figure was arrived at by figuring up what we all agreed was a fair value of the customer list and the exclusive right to write such customers' insurance in the future. * * * this is to certify that [petitioner] was not paid any money for any part of the agreement except the $12,500.00 for his customer list and the exclusive right to write such customers' insurance in the future. No anticipated renewal commissions were involved on policies outstanding at the time of the sale but only the right to write future insurance. In the statutory notice respondent determined: * * * that $12,500.00 of the total consideration received from [Fry and Ryan under the 1954 agreement] constitutes *275 ordinary income and not gain from the sale or exchange of a capital asset, inasmuch as said amount was received for anticipated future renewal commissions and/or as a separate item for the covenant not to compete contained in said agreement. Opinion No extended discussion of the arguments put forth by the parties is necessary. Our opinion in George J. Aitken, 35 T.C. 227 (Nov. 8, 1960), decided shortly after the trial of this case, is indistinguishable in principle. We there held for the taxpayer. That portion of petitioner's personal business consisting of commissions on life insurance and some forms of health and accident insurance involving premiums on policies petitioner had written was evidently retained by him under the 1947 contract. The record shows the accident and health insurance commissions had a value of $121, but it is not clear that the rights to any future commissions due petitioner on policies of health and accident insurance were transferred by the 1954 contract. The rights to future commissions on life insurance policies were not transferred. No argument is made in the filed briefs with respect to the transfer of any future commissions on existing *276 health, accident or life insurance policies and the parties seem to assume only petitioner's main business of fire and casualty insurance was the subject of the transfer. We will make the same assumption. In this case respondent argues first that the "personal business" (or "dailies") which petitioner sold in 1954 is not a capital asset; second, that the amount in question constituted an advance payment made on anticipated renewal commissions; and third, that the amount was paid, at least in part, for a covenant not to compete. Respondent's first and second points were argued and decided against him in the Aitken case and we have found as a fact that petitioner received no part of the amount paid as consideration for the covenant not to compete. Although the language of petitioner's affidavits would seem to support respondent's position, in response to the question: * * * in the first affidavit, you used the language anticipated renewal commission. What did that mean to you at the time that you used that language? Petitioner answered: At that time, we in the insurance business, that it what we called them * * * anticipated renewals. But I found out that the Internal Revenue *277 put some entire different interpretation on that work, like life insurance renewals, a policy that pays commission after the first year without being rewritten in a new policy, that is anticipated renewals. * * * But the thing I was talking about was not anticipated renewals, because what I sold [Fry and Ryan] was a list of names and addresses of policies who had paid the premiums on those policies and I had received all of the commission * * *. Neither did [Fry and Ryan] receive any further commission unless they were able to write new policies at the expiration of the policies in force. Fry testified to the same effect; that all the purchasers were buying were dailies, and records; and that they were anticipating they could renew the fire and casualty policies from which they could get commissions. We accept this explanation. Our decision on the main issue disposes of the additions to tax. On the authority of George J. Aitken, supra.
Decision will be entered for the petitioner.